Filed 10/31/13  P. v. Lomeli CA2/2

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B242595 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA359567) |
| v. | |
| JOSE ANTONIO LOMELI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Ronald H. Rose, Judge.  Affirmed.

Robert Franklin Howell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellant Jose Antonio Lomeli appeals from the judgment entered upon his conviction by jury of first degree murder (Pen. Code, § 187, subd. (a),[1] count 1), and willful, deliberate, and premeditated attempted murder (§§ 664, 187, subd. (a), count 2). The jury found true the firearm allegations that a principal personally used a firearm (§ 12022.53, subds. (b), (e)), personally and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)), and did so causing death (§ 12022.53, subds. (d), (e)). The jury also found true the criminal street gang allegation (§ 186.22, subd. (b)(1)(C)). The trial court sentenced appellant to a mandatory term of 75 years to life in state prison, plus a life term. The court awarded appellant 1,046 days of actual custody credit.

Appellant contends (1) there was insufficient evidence to support his convictions, (2) there was insufficient evidence to support the true finding on the gang allegation, and (3) he was deprived of his right to due process of law because he was convicted of "drive-by murder" but was not charged with that offense. Finding no error, we affirm the judgment.

## FACTUAL SUMMARY

**Prosecution Case**

### *The Shooting*

In April 2009, Ivan Valencia moved from East Los Angeles to a house on West 55th Street in Los Angeles. On July 17, 2009, at approximately 10:30 a.m., Juan Gonzalez drove to Valencia's house and asked Valencia to help him make deliveries from his truck. Gonzalez and Valencia were both longtime members of the Temple Street gang. Valencia pointed to a white car down the street and told Gonzalez it belonged to a rival gang member with whom he had problems. Valencia got in the passenger seat and Gonzalez drove westbound on West 55th Street, turned right on South Hoover Street, and then drove eastbound on West 54th Street. Valencia wanted to stop for food but Gonzalez could not find a parking space for the truck and continued driving

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

to Main Street.  As Gonzalez turned westbound on West 55th Street, a white car passed the truck on the driver's side and somebody inside the car yelled out.  Gonzalez slammed on the brakes when the car cut him off.  Valencia told Gonzalez to get down and said "it's that guy from B.M.S."[2]  The passenger in the white car stuck out his hand and Gonzalez heard four or five "pops" as he ducked down.  The white car sped off and Gonzalez saw that Valencia was bleeding from the back of his head and there was also blood coming from his mouth.

Los Angeles Police Department (LAPD) Officer Gerald Harden responded to the shooting.  Gonzalez told Officer Harden that a white Chrysler or Dodge car cut him off and the passenger shot at him.  The car was similar to an Intrepid sedan Valencia had shown him earlier.  Officer Harden saw three bullet holes on the windshield and two bullet holes on the front of the truck.  Five nine-millimeter casings were recovered at the scene.  After Gonzalez received medical attention, LAPD Detective Daniel Gersna asked him about the location where Valencia had earlier pointed out the white car.  Gonzalez directed Detective Gersna to an address on West 54th Street around the block from Valencia's house.  A white Dodge Intrepid was parked in appellant's driveway.  Gabriella Daisy Avila, the mother of appellant's children, was the registered owner of the vehicle and appellant was listed as a secondary owner.  Gonzalez identified appellant as the shooter when shown a six-pack photographic lineup by Detective Gersna.  He said appellant "look[ed] similar to the guy that shoot (sic) my friend Ivan."

Detective Gersna was able to trace the route taken by Gonzalez.  Surveillance videos from three separate liquor stores captured appellant's Dodge Intrepid following Gonzalez's truck.  Appellant followed Gonzalez's truck as it turned right onto South Hoover Street and east on West 54th Street.  The Dodge Intrepid stopped briefly outside appellant's house.  The front passenger of the vehicle ran inside appellant's house.  The same passenger reentered the vehicle within 30 seconds and continued along the route taken by Gonzalez's truck.  The video captured the Dodge Intrepid as it continued to

---

**2**     The Barrio Mojados (BM) gang identified itself with the initials B.M.S.

follow Gonzalez's truck along West 54th Street. On July 27, 2009, appellant was arrested and Detective Gersna conducted a search of his residence. An unexpended nine-millimeter bullet was found in the rear cargo area of a Chevrolet Tahoe parked in the driveway at the rear of the residence. The Dodge Intrepid was located in the garage. Appellant said he had the Intrepid for about four months but it "broke down" when he first got it and "it [did not] turn." Detective Gersna testified the Intrepid was started up and was drivable when towed by police personnel.

Jeffrey Gutstadt, a forensic pathologist and deputy medical examiner for the Los Angeles County Department of Coroner, testified that Ivan Valencia died of a gunshot wound to the head. The bullet entered the left side of the head and perforated the brain. Fadil Biraimah, a criminalist with the LAPD Scientific Investigation Division, testified that a nine-millimeter Luger was used in the shooting. The live cartridge found in the Chevrolet Tahoe during the search of appellant's residence was found to have been cycled through the same handgun that was used in the shooting. Appellant's fingerprints were found on the rear passenger door of the Dodge Intrepid. Fingerprints belonging to Avila and Ernesto Valdez, an active member of BM, were found on the driver's side.

### Gang Evidence

#### a.     Temple Street

LAPD Officer Hugo Ayon was the prosecution's gang expert on the Temple Street gang. He was familiar with both the Temple Street and the BM gangs and had testified numerous times as a gang expert. He testified that common tattoos among Temple Street gang members include "TST," an abbreviation for Temple Street, and "1923," the year in which the gang was founded. Temple Street and BM were neighboring gangs and Temple Street gang considered all gangs that bordered their territory to be rivals.

Gonzalez joined the Temple Street gang in 1992 and had a tattoo of the letters "TST" on his right hand. Gonzalez had known Valencia for fifteen years. Valencia was also a member of the Temple Street gang and sported a number of that gang's tattoos.

When asked a hypothetical question based on the facts of this case, Officer Ayon opined that the shooting was committed for the benefit of and in association with a

4

criminal street gang. His opinion was based on the notion that gangs use violence to establish fear and intimidation to control their territory and a member of a gang was obligated to take violent action upon contact with a rival gang member. The killing enhanced the reputation of the gang and the ability of the gang members to commit further crimes without worry that community members will report them to the police. Killing a rival gang member would be the ultimate crime for the benefit of the gang because it demonstrated that one was not afraid to use deadly violence against rivals. Not only was the shooter's reputation enhanced but the driver of the vehicle proved to the gang that he could be trusted to take part in a crime that benefitted the gang.

### b. Barrio Mojados

LAPD Officers Gabriel Gonzales and Brandi Pearson had extensive training and experience in gang enforcement detail and were familiar with BM. Officer Gonzales testified that the territory controlled by BM included West 54th Street from Vermont Avenue on the west side to Slauson Avenue on the south and Grand Avenue on the east side. Temple Street gang members started moving into that territory in the 1990's and BM considered them to be their main rivals. BM gang members referred to themselves as "Wet Town" and were associated with the initials B.M.S. and the numbers four three, eight two, and five four for the 54th Street clique. Appellant had a tattoo which stated "Wet Town" on the back of his neck, a "B" and an "M" on his right forearm, and the numbers "54" on his left wrist.

Officer Pearson testified that BM's primary activities included felony vandalism, street robberies, assault with a deadly weapon, attempted murder and murder. Officer Pearson testified to the commission of two predicate crimes committed by BM gang members. Victor Ventura was convicted of murder in 2008, and Lorenzo Gomez was convicted of possession of a firearm in 2009.

**Defense Case**

No evidence was presented on behalf of appellant.

5

## DISCUSSION

### I. Appellant's Convictions for Murder and Attempted Murder

#### A. *Contention*

Appellant contends there was insufficient evidence of his actual participation in the shooting. He argues the evidence was insufficient to sustain his conviction under a theory that he was an aider and abettor to the shooting and his convictions must therefore be reversed.

#### B. *Relevant Authority*

"The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence–that is, evidence which is reasonable, credible, and of solid value–such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.)

If the verdict is supported by substantial evidence, we are bound to give due deference to the trier of fact and not retry the case ourselves. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The standard of review is the same in cases where the prosecution relies primarily on circumstantial evidence. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

#### C. *Evidence Sufficient*

The prosecutor argued that appellant was guilty of murder and attempted murder either as the actual shooter or in the alternative as an aider and abettor to the shooting. The jury was instructed with CALCRIM No. 401, which set forth the elements of an aider and abettor.[3]

---

[3] The jury was instructed with CALCRIM No. 401 as follows: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must

6

There is no dispute that appellant was a member of BM and that Valencia was a member of the Temple Street gang. The gangs were rivals and Valencia lived in BM territory approximately one block from appellant. On the morning of the shooting, Valencia pointed out a white car close to his house and told Gonzalez he was having problems with the gang member who owned the car. Gonzalez testified that the gunfire that killed Valencia was fired from a white car that looked like the car Valencia had pointed out earlier. Valencia told Gonzalez to get down because it was the guy "from B.M.S." Gonzalez told Officer Harden and Detective Gersna the car was a Dodge Intrepid and directed Detective Gersna to appellant's house where the Intrepid was located. Gonzalez identified appellant from a six-pack photo lineup as the person who "look[ed] similar" to the shooter. The liquor store surveillance videos captured appellant's Dodge Intrepid as it followed Gonzalez's truck, stopped momentarily at appellant's house while the passenger went inside and quickly returned and then followed Gonzalez's truck again immediately prior to the shooting. A live nine-millimeter cartridge found in appellant's other vehicle was found to have been cycled through the same handgun as the one that was used in the shooting. Appellant's fingerprints were found on the Dodge Intrepid.

Appellant was identified as a participant in the crime by the eyewitness identification of Gonzalez and there was substantial circumstantial evidence he was in the

prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. [¶] However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

7

Intrepid at the time the shots were fired. The circumstances of the shooting indicate that when Valencia and Gonzalez entered Barrio Mojados's territory they were specifically targeted by appellant as evidenced by the surveillance videos of appellant following Gonzalez's truck. The testimony that somebody in the car yelled at Gonzalez and Valencia before cutting them off and then shooting at them supported an inference that appellant and the other occupant of the Intrepid chased Gonzalez and Valencia for the purpose of committing murder.

In addition, we note that appellant lied in his police interview indicative of a consciousness of guilt. Appellant stated that both the Chevy Tahoe and Dodge Intrepid were inoperable and had been so for months. The surveillance cameras captured the Intrepid as it followed Gonzalez's truck on the day of the shooting. Detective Gersna testified that the Intrepid started up and was drivable when he found it in appellant's garage.

As stated previously, circumstantial evidence may be sufficient to connect appellant to a crime and to prove his guilt beyond a reasonable doubt. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Bean* (1988) 46 Cal.3d 919, 932–933.)

Sufficient evidence supports a finding that appellant was a participant in the murder, either as the shooter or as an aider and abettor who drove the car containing the shooter. Appellant presented no evidence whatsoever that he may have "loaned" the car to a third person and his suggestion on appeal is without merit.

## II.     Substantial Evidence Supported the Gang Enhancement Allegation

### A.     Contentions

Appellant contends that since the substantive counts of murder and attempted murder must be reversed due to lack of substantial evidence "the enhancements a fortiori

must be stricken." Appellant also argues that the gang enhancements must be stricken because they are not supported by substantial evidence.

### B.     Relevant Authority

A gang enhancement finding is reviewed under the substantial evidence standard. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.) To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) The crime must be "'gang related.'" (*People v. Gardeley* (1996) 14 Cal.4th 605, 622, 625, fn. 12; *People v. Castaneda* (2000) 23 Cal.4th 743, 745 [gang enhancement statute "increases the punishment for some gang-related crimes"]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 56 [gang enhancement statute "applies when a crime is gang related"].) A defendant's mere membership in the gang does not suffice to establish the gang enhancement. (*People v. Gardeley, supra*, at pp. 623–624.) Rather, "'[t]he crime itself must have some connection with the activities of a gang.'" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199.) "[T]o prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs. [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048.)

### C.     First Element:  For the Benefit of and in Association with a Gang

The first element of the gang enhancement may be satisfied by showing any one of the following—the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).)

Here, the testimony of the gang expert, Officer Ayon, provided ample evidence that the crimes were committed for the benefit of the BM gang. (See *People v. Albillar* (2010) 51 Cal.4th 47, 63 ["[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)"].)

9

Officer Ayon explained the importance of respect and territory in gang culture. Gangs use violence to instill fear and intimidation and maintain control over their territory. Confrontations with rival gangs over territory are linked to respect and gang members are "obligated to take some kind of violent action upon contact or crossing paths with a rival." Officer Ayon testified that if an individual BM gang member, such as appellant, fails to challenge a rival gang member, such as Valencia, he will look weak and lose respect. If the BM gang was not feared they would lose respect which would lead to a loss of territory, whereas a violent crime such as occurred here, instilled fear and intimidation into the community. The murder of a rival gang member was considered the ultimate gang crime committed on behalf of the gang. It made the rival gang smaller and weaker while enhancing the reputation of their own gang as a violent gang that did not hesitate to use violence.

The BM gang considered the Temple Street gang as their chief rival since the 1990's when Temple Street gang members started moving into their territory. The evidence showed that Valencia, a member of the Temple Street gang, moved into a house on West 55th Street in BM territory approximately three months before the shooting. Valencia told Gonzalez on the morning of the shooting that he was involved in a dispute with a specific BM gang member and pointed out a white car that belonged to that gang member. Later, when that car cut off Gonzalez's truck and the occupants yelled out something, Valencia again identified it as "that guy from B.M.S."

From this evidence, it was reasonable to infer that the shootings of Valencia and Gonzalez instilled fear and intimidation in the community. BM's status was enhanced because rival gangs saw that BM protected their territory by murdering a rival gang member. Thus, there was substantial evidence of the "benefit of" prong of the enhancement.

We find no merit to appellant's contention that Officer Ayon's expert opinion was not based on facts and lacked evidentiary value. At the time of the trial, Officer Ayon had 12 years experience as an LAPD police officer with the last 11 years in the Rampart Division where the BM gang members were active. He was assigned to the Rampart

gang enforcement detail, had over a thousand contacts with gang members and investigated gang-related crimes. He testified as a gang expert in excess of 20 times and lectured on the lifestyle and gang culture of Los Angeles based gangs. The prosecutor's hypothetical questions were rooted in the facts shown by the evidence and were not based on "'assumptions of fact without evidentiary support.'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.) "A gang expert may render an opinion that facts assumed to be true in a hypothetical question present a 'classic' example of gang-related activity, so long as the hypothetical is rooted in facts shown by the evidence." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551, fn. 4.) Officer Ayon, an expert on gang culture in general and the BM gang in particular, was qualified to explain how criminal conduct could enhance the gang's reputation or benefit the gang. (*People v. Ward* (2005) 36 Cal.4th 186, 209–210.)

### D.      Second Element:  Specific Intent

With respect to the requirement that appellant committed the felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1)), appellant need only have had the specific intent to promote, further, or assist in any criminal conduct by gang members, including the current offense, and not necessarily other criminal conduct by gang members. (*People v. Albillar, supra,* 51 Cal.4th at pp. 64–65.) "[T]he scienter requirement in section 186.22(b)(1)—i.e., 'the specific intent to promote, further, or assist in any criminal conduct by gang members'— is unambiguous and applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Id.* at p. 66.)

Murder and attempted murder were among BM's primary activities and Officer Ayon testified that the crime would benefit the gang in a number of ways. The community in which the gang members lived and where the crimes took place would be intimidated because it would show BM was active and took the ultimate step of murdering a rival gang member to protect its territory. A reasonable juror could conclude, based on the evidence presented at trial, that when appellant murdered

11

Valencia and attempted to murder Gonzalez it was gang-related conduct committed to retaliate against Valencia for moving into appellant's territory and thereby disrespecting appellant. The crimes enhanced BM's reputation for violence and helped appellant maintain the respect he required as a member of the gang. Therefore, we conclude that substantial evidence supports the finding that appellant committed the felonies with the specific intent to promote criminal conduct by gang members.

Appellant's contention that there was no evidence of a gang challenge is without merit. In *People v. Albillar, supra,* 51 Cal.4th 47, there was no gang graffiti, no throwing of gang signs, and no mention of their gang. Despite that lack of attribution, the Court concluded the evidence was sufficient to support a finding that the crimes met the gang-related prong of section 186.22, subdivision (b)(1). (*People v. Albillar, supra,* at pp. 60–62.) Therefore the lack of attribution to a gang alone cannot be the basis for a finding of insufficient evidence.

## III.     Appellant was Properly Charged and Convicted of First Degree Murder

Appellant claims that he was "charged with premeditated malice murder, but was convicted of the separate, uncharged, and non-included offense of 'drive-by murder.'" He contends he was deprived of his right to due process of law because the amended information did not contain an allegation of "drive-by" murder or refer to the discharge of a firearm from a motor vehicle.

Appellant concedes felony murder and malice murder are included within a charge of murder. (*People v. Davis* (1995) 10 Cal.4th 463, 514.) However, he argues drive-by murder is a separate offense alleging a distinct crime not merely a different theory of a violation of section 187. Appellant notes drive-by murder has elements not included in malice murder, namely, discharge of a firearm from a motor vehicle. Drive-by murder also is not included within felony murder because, unlike felony murder, it requires the specific intent to kill. Drive-by murder was added to section 189 in 1993. (Stats. 1993, ch. 611, § 4.5, p. 3507.)

Appellant's contention is meritless. As explained in *People v. Rodriguez* (1998) 66 Cal.App.4th 157, section 189 establishes three categories of first degree murder. The

12

first category consists of "various types of premeditated killings, and specifies certain circumstances (use of explosives or armor-piercing ammunition, torture, etc.) which are deemed the equivalent of premeditation. Section 189 secondly establishes a category of first degree felony murders (murders perpetrated during felonies or attempted felonies such as arson, rape, carjacking, etc.). Finally, section 189 establishes a third category consisting of only one item, intentional murder by shooting out of a vehicle with intent to kill." (*People v. Rodriguez*, *supra*, at pp. 163–164.) Although drive-by murder differs from both first degree premeditated murder and felony murder (*People v. Chavez* (2004) 118 Cal.App.4th 379, 386), it nonetheless is merely a theory of first degree murder and it is well settled that an accusatory pleading charging a defendant with murder need not specify the theory of murder upon which the prosecution intends to rely. (*People v. Hughes* (2002) 27 Cal.4th 287, 369.)

Furthermore, the information included section 12022.53 enhancement allegations, which put appellant on notice of the People's intent to establish that he personally, or a principal, personally and intentionally discharged a firearm during the murder; the testimony at the preliminary hearing gave appellant adequate notice of the People's theory; the evidence at trial, previously discussed in our Factual Summary, alerted appellant to the first degree drive-by murder theory, including its requisite conduct and intent; and, appellant did not object at the section 402 hearing during the People's case-in-chief when the People made clear its intent to proceed on a drive-by theory of first degree murder. Appellant had every opportunity to present a defense based on the People's theory and did not do so.

Appellant was properly charged and convicted of first degree murder.

13

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

FERNS

We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.